**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| CARLOS J. LOPEZ, | CASE NO. 1:22-CV-01801 |
| Plaintiff, | |
| vs. | |
| | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | **MEMORANDUM OPINION AND ORDER** |

Plaintiff Carlos J. Lopez ("Plaintiff" or "Mr. Lopez") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (ECF Doc. 7.)

For the reasons set forth below, the Court **AFFIRMS** the Commissioner's final decision.

## I.      Procedural History

Mr. Lopez filed his SSI application on February 11, 2020.  (Tr. 16, 78, 163-69.)  He alleged a disability onset date of January 1, 2018.  (Tr. 16, 78, 163.)  He alleged disability due to asthma, back problems, and depression.  (Tr. 79, 89, 102, 110, 184.)  After initial denial by the state agency (Tr. 98-102) and denial upon reconsideration (Tr. 108-10), Mr. Lopez requested a hearing (Tr. 112-14).  A telephonic hearing was held before an Administrative Law Judge ("ALJ") on August 19, 2021.  (Tr. 38-73.)  The ALJ issued an unfavorable decision on September 1, 2021, finding Mr. Lopez not disabled.  (Tr. 13-37.)  The Appeals Council denied

Mr. Lopez's request for review of the ALJ's decision on August 8, 2022, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-7.)  Mr. Lopez then filed the pending appeal.  (ECF Doc. 1.)  The matter is fully briefed.  (ECF Docs. 9 & 11.)

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Mr. Lopez was born in born in 1972.  (Tr. 31, 42.)  He was in special education classes (Tr. 453) and has a high school education (Tr. 31, 42, 453).  He has past relevant work as a glass installer.  (Tr. 31, 46-48, 66.)

### B.    Medical Evidence

#### 1.    Relevant Treatment History

##### i.    Physical Impairments

Plaintiff has a history of treatment for asthma and back problems.  On October 21, 2019, Mr. Lopez presented to the emergency room at Fairview Hospital, complaining of shortness of breath associated with waxing and waning of moderate burning chest discomfort, worse with coughing.  (Tr. 243-44.)  He reported that his nebulizer helped for an hour or two, but his inhaler did not help.  (Tr. 244.)  He was diagnosed with mild asthma with exacerbation.  (Tr. 245.)  He was discharged the same day in an improved and stable condition.  (Tr. 246.)

Mr. Lopez presented to Sasha Yurgionas, M.D., at Neighborhood Family Practice on November 14, 2019, for follow up regarding back pain.  (Tr. 325.)  He reported "[a]chy pain in [his] bilateral lumbar muscles, deep."  (*Id*.)  He reported no loss of bladder or bowel control and no numbness, tingling, or weakness.  (*Id*.)  He felt that "[v]ery little" alleviated his pain and he thought that physical therapy was not effective and would only worsen his pain.  (*Id*.)  He said he was applying for social security disability due to his pain and requested medication refills.  (*Id*.)

On examination, Mr. Lopez had: a normal heart rate and rhythm, normal breath sounds and pulmonary effort, no musculoskeletal edema, normal gait and station, normal lumbar lordotic curvature, non-tenderness to palpation at spinous process, tenderness to palpation at bilateral lumbar musculature, and appropriate range of motion with full forward flexion and extension without pain. (Tr. 326.) His lateral bending to the right and left was okay. (*Id*.) He was alert and oriented to person, place, and time. (*Id*.) His mood and affect were normal. (*Id*.) A lumbar x-ray taken on November 15, 2019, showed mild spondylosis and facet arthropathy at the lumbosacral junction, with no acute fracture. (*Id*.) Mr. Lopez was diagnosed with facet arthritis of the lumbar region, spondylosis of the lumbar region without myelopathy or radiculopathy, moderate persistent asthma, insomnia, dysthymia, and chronic allergic rhinitis. (Tr. 326-27.) For Mr. Lopez's back conditions, Dr. Yurgionas recommended continued intermittent use of NSAIDs and a muscle relaxant, use of a heating pad, and a referral to the spine clinic; Mr. Lopez refused a referral for physical therapy. (Tr. 326.) Dr. Yurgionas also prescribed an inhaler, nebulizer, and montelukast for asthma and allergic rhinitis. (Tr. 326-27.)

Mr. Lopez presented to Brian Bouchard, M.D., at Neighborhood Family Practice on February 11, 2020, for a six-month check-up and for medication refills. (Tr. 323.) His reported concerns were "high sugar and back pain." (*Id*.) He was not exercising due to his back pain; he reported that he had missed a physical therapy appointment, but planned to "get back on track to rehab his back and get back to exercising." (*Id*.) He reported that Flexeril helped him relax at night and sleep. (*Id*.) He said he was using albuterol for his asthma, but he was not taking his controller medication because he lost it. (*Id*.) He was taking Trazadone a few times a week for insomnia when his allergies were bad. (*Id*.) On examination, Mr. Lopez was in no acute distress with normal mood and behavior. (Tr. 324.) He was alert and oriented to person, place, and time.

3

(*Id.*)  He had a normal heart rate and rhythm, normal pulmonary effort, no respiratory distress, normal breath sounds, and no wheezing or rhonchi.  (*Id.*)  His abdomen was soft with no mass, tenderness, or guarding.  (*Id.*)  He had no musculoskeletal swelling, no cervical adenopathy, no focal deficit or cranial nerve deficit, and normal reflexes.  (*Id.*)  His deep tendon reflexes were normal.  (*Id.*)  He was diagnosed with chronic midline low back pain without sciatica, spondylosis of lumbar region without myelopathy or radiculopathy, chronic allergic rhinitis, insomnia, and moderate persistent asthma.  (*Id.*)  His treatment plan for his back pain included 800 mg Ibuprofen three times each day as needed and Flexeril at night.  (Tr. 324-25.)  His medications for his asthma, allergic rhinitis, and insomnia were continued.  (*Id.*)

Mr. Lopez presented to Mandy Healey, APRN, CNP, at Neighborhood Family Practice on July 9, 2020, complaining of lower back pain that he described as a dull ache.  (Tr. 383.)  He also complained of anxiety and depression.  (*Id.*)  He reported no pain in his legs or hips.  (*Id.*)  He said his pain was worse with lifting, twisting, and bending with heavy objects.  (*Id.*)  He was "trying to remain physically active with exercise and kids."  (*Id.*)  He reported taking Flexeril and over the counter NSAIDs without much relief.  (*Id.*)  He said that his pain was not constant, but it was "easily aggravated."  (*Id.*)  On examination, he was alert and oriented to person, place, and time.  (Tr. 384-85.)  His heart rate and rhythm and were normal and he had normal pulmonary effort.  (Tr. 385.)  He had normal neck and musculoskeletal range of motion and no cervical adenopathy.  (*Id.*)  CNP Healey administered steroid injections in the bilateral lumbosacral soft tissue, and she prescribed meloxicam and at home physical therapy exercises as tolerated.  (*Id.*)  She also adjusted Mr. Lopez's medications for depression and anxiety and provided a referral for counseling.  (*Id.*)

Mr. Lopez returned for a telemedicine visit with Dr. Bouchard on August 6, 2020.  (Tr. 381-83.)  His chief complaint was hand pain.  (Tr. 382.)  He reported that he started to have pain in his left hand two to three weeks earlier, and said that it was painful for him to lift and grab items.  (*Id*.)  He reported that there was a small bump in his left hand under a vein; it was tender and had been present for a while.  (*Id*.)  He reported no benefit from the lumbar steroid injection and said he was interested in seeing someone in the spine clinic.  (*Id*.)  Dr. Bouchard noted that he had referred Mr. Lopez to the spine clinic once before, but Mr. Lopez had not scheduled an appointment.  (Tr. 383.)  Dr. Bouchard provided Mr. Lopez with the number for the spine clinic and advised him to call to schedule with them.  (*Id*.)  It was also noted that Mr. Lopez had not scheduled an appointment with a counselor following his July referral.  (Tr. 382.)

On October 19, 2020, Mr. Lopez returned to Dr. Yurgionas for follow up regarding his back pain.  (Tr. 378-79.)  He was "[v]ery frustrated with daily chronic back pain" and felt that it depressed and fatigued him, but he said he was not interested in seeing a specialist or trying physical therapy.  (Tr. 379.)  On examination, Mr. Lopez was alert, oriented to person, place, and time, and in no distress.  (Tr. 380.)  His heart rate and rhythm were normal, and he had normal pulmonary effort and breath sounds with no respiratory distress.  (*Id*.)  He had no edema, and his gait and station were normal.  (*Id*.)  He had a normal lumbar lordotic curvature and was not tender to palpation at the spinous process, but was tender to palpation at the lumbar musculature bilaterally.  (*Id*.)  His range of motion was appropriate, with full forward flexion and extension without pain; his right and left lateral bending were okay.  (*Id*.)  Dr. Yurgionas referred Mr. Lopez to physical therapy and the spine clinic, and administered a steroid injection.  (Tr. 381.)

On November 2, 2020, Mr. Lopez presented to CNP Healey for a virtual visit.  (Tr. 377-78.)  He reported that he saw physical therapy that day.  (Tr. 377.)  He said he was miserable, his

muscle relaxant made him drowsy and nauseated, and he was not sleeping well.  (*Id*.)   He requested Percocet for his pain and reported that he was scheduled to see Dr. Goyal in the orthopedic spine clinic that month.  (*Id*.)  He had been getting injections in his back for his pain, but said they were no longer providing him relief.  (*Id*.)  During the visit, CNP Healey noted that Mr. Lopez "became very demanding, interrupting and talking over [her] advice/discussion . . ., demanding that [she] prescribe him Percocet and declining other therapeutic interventions."  (*Id*.; *see also* Tr. 378.)  CNP Healey ended the call due to Mr. Lopez's "argumentative and disruptive" behavior.  (Tr. 378.)

On November 17, 2020, Mr. Lopez presented to spine specialist Kush Goyal, M.D., at Fairview Hospital.  (Tr. 416-20.)  He complained of a history of pain in the lumbar spine for six or more years.  (Tr. 416.)  He reported feeling "intermittent shock that last[ed] for a few seconds."  (*Id*.)  He reported no numbness or tingling.  (*Id*.)  He said his pain was constant and described the pain as "burning and sharp."  (*Id*.)  He rated his pain that day as a seven on a scale of one to ten, with his worst pain being a ten.  (*Id*.)  He said his pain was the worst when he was performing activities, and was exacerbated when he was in static positions for longer than twenty minutes.  (*Id*.)  His pain decreased when he changed positions and with the use of Flexeril and Mobic.  (*Id*.)  He denied gait imbalance and denied using an assistive device.  (Tr. 416-17.)  On examination, Mr. Lopez was oriented to person, place, and time.  (Tr. 418.)  His mood was pleasant.  (*Id*.)  His heart rate was regular.  (*Id*.)  There was no edema.  (*Id*.)  There was no pain in the spinous process or paraspinals, and his muscle tone and bulk were normal.  (*Id*.)  His gait was non-antalgic and his ability to tandem walk was intact.  (*Id*.)  He had full cervical and shoulder range of motion without pain.  (Tr. 418-19.)  Tinel's and Phalen's testing in the wrists was negative bilaterally.  (Tr. 419.)  He had: limited range of motion with lumbar flexion, with

end-range pain; full range of motion with lumbar extension, with end-range pain; and full range of motion with lateral bending bilaterally without pain. (*Id*.) Straight leg raise was negative bilaterally. (*Id*.) His sensation, strength, and reflexes were normal. (Tr. 419-20.) Mr. Lopez was diagnosed with chronic low back pain without sciatica. (Tr. 420.) Dr. Goyal ordered imaging of the lumbar spine and prescribed a Medrol dose pack. (*Id*.) He recommended therapy, a lumbar facet injection, and follow up in two months.[1] (*Id*.) X-rays of the lumbar spine taken that same day revealed lumbar spondylosis (Tr. 421-24).

During a virtual visit with Melanie Golembiewski, M.D., at Neighborhood Family Practice on November 18, 2020 (Tr. 398-400), Mr. Lopez's Flexeril was discontinued due to drowsiness (Tr. 399). Dr. Golembiewski prescribed heating pads for his back. (*Id*.)

Mr. Lopez started physical therapy at the Cleveland Clinic in November 2020, attending seven sessions through January 18, 2021. (Tr. 606.) On November 20, 2020, he showed improvement in his postural alignment, pain, and activity tolerance. (Tr. 413.) His straight leg raise testing was negative bilaterally. (*Id*.) He reported that he was sleeping better for the last few days, and that he felt a lot better after walking on a treadmill for thirty minutes twice the previous weekend. (Tr. 414.) He also reported that he was using an exercise ball and planned to do more walking. (*Id*.) At his December 4, 2020 appointment, he reported a flare up of his low back pain after performing a lot of work around the house, which included lifting twenty bags of cement. (Tr. 410-11.) He continued to have problems sleeping, but his sleep had improved since starting therapy. (Tr. 411.) His pain was the worst with sitting and better with standing, walking, and lying down. (*Id*.) He rated his pain level a five out of ten at best, six out of ten on average, and an eight to nine out of ten at worst. (*Id*.) Mr. Lopez's pain was noted to improve

---

[1] A future office visit with Dr. Goyal was planned for February 16, 2021. (Tr. 430.) It is not clear from the record whether this visit took place. Neither party cites to records from such a visit.

during the therapy session with repeated lumbar extension while standing and lying down.  (Tr. 410.)  When he returned for therapy December 14, 2020, he reported that his home exercises were helping a lot with his pain.  (Tr. 627.)  He was walking twenty minutes per day.  (*Id*.)  He continued to have intermittent low back pain, but it was not as intense as it had been at his last visit.  (*Id*.)  At a January 22, 2021 physical therapy appointment, he said his back was good.  (Tr. 602.)  He reported that he had received a cortisone injection that morning and his doctor instructed him not to do therapy that day; the therapy session was cancelled.  (*Id*.)

Mr. Lopez returned to Dr. Yurgionas on January 25, 2021.  (Tr. 478-79.)  He arrived late for his appointment and was upset that he was not seen immediately.  (Tr. 479.)  He reported that: he saw Dr. Goyal in the spine clinic; he was referred for physical therapy, but often missed appointments due to pain; he was referred for an MRI but had not followed up; very little relieved his pain; he felt no relief with NSAIDs; and he felt that physical therapy was ineffective and only worsened his pain.  (*Id*.)  He was focused on obtaining social security disability insurance benefits for his pain.  (*Id*.)  On examination, Mr. Lopez was oriented to person, place, and time; his mood and affect were normal.  (Tr. 480.)  His heart rate, rhythm, and sounds were normal, and he was in no respiratory distress.  (Tr. 479.)  There was no edema, and his gait and station were normal.  (*Id*.)  His lumbar lordotic curvature was normal; there was no tenderness to palpation at the spinous process, but there was tenderness to palpation at the bilateral lumbar musculature.  (Tr. 480.)  He demonstrated an appropriate range of motion with full forward flexion and extension without pain, and his right and left lateral bending were okay.  (*Id*.) Dr. Yurgionas administered a steroid injection.  (*Id*.)

Mr. Lopez saw Dr. Yurgionas on February 8, 2021, for jaw pain.  (Tr. 497-500.)  Aside from jaw pain, he was doing "[g]enerally well" and reported no back pain.  (Tr. 498.)

On April 13, 2021, Mr. Lopez was terminated from physical therapy for not returning to therapy or scheduling follow up appointments.  (Tr. 608.)  At that time, it was noted that Mr. Lopez was "progressing as expected toward functional goals based on documented subjective information on progress."  (*Id*.)

On June 18, 2021, Mr. Lopez returned to Dr. Golembiewski for follow up regarding his back pain. (Tr. 546-47.)  He reported that the steroid injection in January 2021 had helped.  (Tr. 546.)  He denied regular radicular symptoms and reported that he usually had five to six months of pain relief after receiving a steroid injection.  (Tr. 547.)  Mr. Lopez received a steroid injection and Dr. Golembiewski encouraged him to continue with physical therapy.  (*Id*.)

Mr. Lopez returned to physical therapy at the Cleveland Clinic on July 7, 2021.  (Tr. 589.)  He reported difficulty sleeping and said that any prolonged positioning increased his pain. (Tr. 590.)  He reported receiving two injections in his lumbar spine a few weeks earlier, which helped with his pain for about two weeks before his pain returned to the same levels.  (*Id*.)  He reported that he also received chiropractic care for his back.  (*Id*., *see also* Tr. 435-40 (treatment records from chiropractic sessions in July 2021).)  During his chiropractic session on July 6, 2021, he reported low back, right arm, and shoulder pain.  (Tr. 435.)  He said he did "a lot of home painting, and that can increase his symptoms."  (*Id*.)

On July 21, 2021, Mr. Lopez reported that he had been hospitalized for five days with pneumonia.  (Tr. 576.)  He said he was feeling a little better and improving.  (*Id*.)

An MRI of the lumbar spine dated August 17, 2021, showed degenerative changes in the lumbar spine, most notably at L5-S1, with disc height loss, mild grade 1 anterolisthesis, and severe facet degenerative changes with bilateral facet and pedicle edema and moderate bilateral foraminal narrowing.  (Tr. 638-39.)  There were minimal degenerative changes elsewhere.  (*Id*.)

9

ii.      **Mental Health Impairments**

On July 9, 2020, Mr. Lopez presented to CNP Healey at Neighborhood Family Practice with complaints of back pain and depression.  (Tr. 383.)  He said he was sleeping okay, but he continued to have symptoms of depression and anxiety.  (*Id*.)  He was the sole parent for his children, so he always had to be there for everyone else and "had little time to grieve and process past traumas."  (*Id*.)  He denied suicidal and homicidal ideation.  (*Id*.)  He had not had counseling in the past, but was interested in making time for it, and was also interested in getting medication to help with his symptoms.  (*Id*.)  No abnormal mental status examination findings were noted.  (Tr. 384-85.)[2]  Mr. Lopez reported that Trazodone was not helping with his sleep.  (Tr. 383.)  CNP Healey discontinued Trazodone, started Zoloft, and referred him for counseling.  (Tr. 385.)

On November 9, 2020, Mr. Lopez presented for a telephonic behavioral health appointment with Madeleine Keller, LPCC, at Neighborhood Family Practice.  (Tr. 375-76.)  He reported an increase in anger and depression related to his back pain.  (Tr. 376.)  He expressed some remorse for his tone and being argumentative with CNP Healey regarding medication that she would not prescribe for his pain relief.  (*Id*.)  In retrospect, he said he understood CNP Healey's concerns regarding opioids, and was optimistic because he had an appointment scheduled with a specialist.  (*Id*.)  He also reported that he was "[m]inimally more optimistic after starting physical therapy. . . ."  (*Id*.)  On examination, Mr. Lopez was guarded but cooperative, with pressured speech and a depressed and irritated mood.  (*Id*.)  His thought content and thought process were unremarkable.  (*Id*.)  He was alert and fully oriented.  (*Id*.)  His insight and judgment were fair.  (*Id*.)  Towards the end of the appointment, Mr. Lopez spoke

---

[2] Other treatment records from non-mental health providers show normal mental status findings. (Tr. 324, 380, 382-83, 479-80, 499.)

more abruptly.  (*Id.*)  LPCC Keller noted that they might plan to build from shorter to longer sessions due to issues with Mr. Lopez's "lowered distress tolerance. . . ."  (*Id.*)

During an appointment with Dr. Golembiewski on November 18, 2020, Mr. Lopez reported that his mood was okay.  (Tr. 398.)  He said that he was talking to a therapist and feeling better on 100 mg of Zoloft.  (*Id.*)  His behavior was normal on examination.  (Tr. 399.)

On December 21, 2020, Mr. Lopez presented to Laura Rocker, M.D., at Neighborhood Family Practice for a telehealth visit for an initial psychiatric evaluation.  (Tr. 447-54.)  He reported that he lived with his fiancée, his seven-year-old son, and his seventeen-year-old daughter; his son had Crohn's disease and was in the hospital.  (Tr. 447.)  He said he was not working because of issues with his back.  (*Id.*)  He was feeling depressed and irritable, and worried about everything.  (Tr. 448.)  He reported trouble sleeping and said he was disorganized and could not concentrate or remember things.  (*Id.*)  He was very impulsive and had cleaning compulsions.  (*Id.*)  He denied suicidal ideation.  (*Id.*)  He reported a traumatic childhood.  (Tr. 451.)  He said he drank alcohol occasionally and smoked "weed" approximately every week or two.  (Tr. 453.)  He reported that he graduated high school.  (*Id.*)  On examination, Mr. Lopez was cooperative and well-groomed with good eye contact.  (*Id.*)  He had a euthymic mood with a full range of affect, normal speech, goal-directed thought processes, fair insight, and good judgment.  (*Id.*)  There were no perceptual disturbances and no suicidal or homicidal ideation. (*Id.*)  Dr. Rocker provided provisional diagnoses of: ADHD; OCD; and major depression, mild. (Tr. 454.)  Dr. Rocker prescribed Wellbutrin 300 mg and Seroquel 25 mg.  (*Id.*)

Mr. Lopez returned for follow-up medication management appointments with Dr. Rocker on January 13, 2021 (Tr. 467-70), March 31, 2021 (Tr. 524-27), June 23, 2021 (Tr. 564-67), and

July 21, 2021 (Tr. 575-78).[3]  In January 2021, Mr. Lopez reported he was doing better.  (Tr. 467.)  He was feeling calmer and sleeping better and his mood was good.  (*Id*.)  Mental status findings were similar to findings in December 2020.  (*Compare* Tr. 469 *with* Tr. 454.)  No changes were made to Mr. Lopez's medications and Dr. Rocker noted that Mr. Lopez's major depression was in partial remission.  (Tr. 470.)

During Mr. Lopez's appointments with Dr. Rocker in March 2021 and June 2021, he reported some increased symptoms.  (Tr. 525, 565.)  In March 2021, he reported he was doing well and did not feel depressed, but said he was irritable, hyperactive, and not sleeping well, and felt he needed more medicine.  (Tr. 525.)  There were no mental status examination findings recorded at the March visit.  (Tr. 526.)  Dr. Rocker increased Mr. Lopez's Seroquel to 50 mg. (Tr. 527.)  In June 2021, Mr. Lopez reported that Seroquel made him drowsy, but he could not sleep.  (Tr. 565.)  He said his back pain was "rough," and reported feeling stressed, on edge, moody, and cranky.  (*Id*.)  He was having nightmares and thought he was seeing and hearing things.  (*Id*.)  He was interested in therapy but said he had not heard from Neighborhood Family Practice.  (*Id*.)  On examination, Mr. Lopez was well-groomed and made good eye contact.  (Tr. 566.)  His speech was clear without pressure.  (*Id*.)  He was depressed with a full range of affect. (*Id*.)  His thought processes were goal directed.  (*Id*.)  His insight was limited, but his judgment was good.  (*Id*.)  Dr. Rocker increased Mr. Lopez's Seroquel to 100 mg and diagnosed him with bipolar disorder.  (Tr. 566-67.)

When Mr. Lopez presented for his medication management appointment with Dr. Rocker on July 21, 2021, he said he had been in the hospital with pneumonia, but was feeling better and improving.  (Tr. 576.)  He said he needed a form completed for SSI.  (*Id*.)  Mr. Lopez reported

---

[3] Dr. Rocker called Mr. Lopez on April 28, 2021, for a visit, but Mr. Lopez was not available.  (Tr. 535.)

that he was sleeping much better, "like a baby." (*Id.*)  On examination, Mr. Lopez was

cooperative and well-groomed.  (Tr. 577.)  His mood was euthymic with an appropriate affect.

(*Id.*)  His speech was clear without pressure and his thought processes were goal directed.  (*Id.*)

There was no suicidal or homicidal ideation.  (*Id.*)  His insight and judgment were good.  (*Id.*)

There were no medication changes.  (Tr. 577, 578.)  Dr. Rocker diagnosed: mood disorder which

was definitely depression and probably bipolar; and generalized anxiety disorder.  (Tr. 578.)

### 2.  Opinion Evidence

#### i.  Physical Impairments

##### a.  Treating Source – Dr. Goyal

On August 17, 2021, Dr. Goyal completed a Spine Medical Source Statement.  (Tr. 634-

37.)  Dr. Goyal indicated that he first treated Mr. Lopez in November 2020, and that Mr. Lopez

was diagnosed with chronic back pain, lumbar spondylosis, and lumbar radiculopathy.  (Tr. 634.)

Dr. Goyal opined that Mr. Lopez's prognosis was good.  (*Id.*)  When asked to identify "clinical

findings, laboratory and test results" that showed Mr. Lopez's medical impairment, Dr. Goyal

listed: "arthritis L5-S1 joint more on right." (*Id.*)  Dr. Goyal stated that Mr. Lopez had the

following symptoms: back pain, leg pain, depression/anxiety, and insomnia.  (*Id.*)  Dr. Goyal

also indicated that Mr. Lopez had back and leg pain daily since 2014, worse with standing,

sitting, and bending.  (*Id.*)  Dr. Goyal identified the following "positive objective signs" from a

check-box list: reduced range of motion, tenderness, muscle spasm, impaired appetite or gastritis,

and impaired sleep.  (Tr. 635.)  Dr. Goyal added that Mr. Lopez's reduced range of motion was

with lumbar extension.  (*Id.*)  Dr. Goyal also indicated that emotional factors contributed to the

severity of Mr. Lopez's symptoms, and that a medication side effect of one of Mr. Lopez's

medications—Tizanidine—was drowsiness.  (*Id.*)

13

Dr. Goyal opined that Mr. Lopez could: walk three city blocks without rest or severe pain; sit for ten minutes at one time; stand for twenty minutes at one time; sit for less than two hours total in an eight-hour workday; and stand/walk for less than two hours total in an eight-hour workday.  (Tr. 635.)  Dr. Goyal opined that Mr. Lopez would need: a job that allowed for shifting positions at will from sitting, standing, or walking; periods of walking around during an eight-hour workday, every thirty minutes for an unspecified amount of time; and the ability to take unscheduled breaks every ten minutes and rest for ten minutes before returning to work.  (Tr. 635-36.)  Dr. Goyal further opined that Mr. Lopez could: occasionally lift and carry twenty pounds; rarely lift and carry fifty pounds; and rarely twist, stoop (bend), crouch/squat, climb ladders, or climb stairs.  (Tr. 636.)  Dr. Goyal opined that Mr. Lopez had no manipulative limitations.  (Tr. 636-37.)  Finally, Dr. Goyal opined that Mr. Lopez would likely be off task 25% or more of a typical workday, was capable of only low stress work due to anxiety and depression, would likely have "good days" and "bad days," and would likely miss about two days per month as a result of his impairments or treatment.  (Tr. 637.)

### b.    State Agency Medical Consultants

State agency medical consultant Gail Mutchler, M.D., completed a physical RFC assessment on June 17, 2020 (Tr. 82-84), opining that Mr. Lopez could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday (Tr. 83).  Dr. Mutchler opined that Mr. Lopez could: never climb ladders, ropes, or scaffolds; occasionally stoop; and frequently kneel, crouch, crawl, or climb ramps or stairs.  (*Id*.)  As to environmental limitations, Dr. Mutchler opined that Mr. Lopez would need to avoid concentrated exposure to temperature extremes, humidity, respiratory irritants, and hazards, including unprotected heights.  (Tr. 84-84.)

14

On reconsideration on January 8, 2021, state agency medical consultant Leon Hughes, M.D., affirmed Dr. Mutchler's RFC findings.  (Tr. 93-94.)

### ii.  Mental Impairments

#### a.  Treating Source – Dr. Rocker

On July 28, 2021, Dr. Rocker completed a Mental Impairment Questionnaire.  (Tr. 632-33.)  She reported that she had been seeing Mr. Lopez monthly or bi-monthly for seven months for his diagnoses of bipolar II disorder and generalized anxiety disorder.  (Tr. 632.)  Mr. Lopez was prescribed sertraline, Wellbutrin, and Seroquel, with no side effects.  (*Id*.)  Dr. Rocker indicated that Mr. Lopez demonstrated "clinical findings" of severe anxiety, mood lability, and irritability.  (*Id*.)  She opined that Mr. Lopez's prognosis was "fair" and "guarded."  (*Id*.)

Dr. Rocker rated Mr. Lopez's ability to perform work-related activities, with the following available ratings: "unlimited or very good," "limited but satisfactory," "seriously limited, but not precluded," "unable to meet competitive standards," and "no useful ability to function."  (Tr. 632-33.)

Dr. Rocker opined that Mr. Lopez was "unable to meet competitive standards" in his ability to: complete a normal workday and workweek without interruptions from psychologically based symptoms; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 632-33.)

Dr. Rocker opined that Mr. Lopez was "seriously limited, but not precluded" in his ability to: maintain attention and concentration for extended periods; perform activities within a schedule; manage regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others

15

without being distracted by them; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; ask simple questions or request assistance; and respond appropriately to changes in the work setting.  (Tr. 632-33.)

Dr. Rocker opined that Mr. Lopez had a "limited but satisfactory" ability to: carry out detailed instructions; remember locations and work-like procedures; understand and remember detailed instructions; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and set realistic goals or make plans independently of others.  (Tr. 632-33.)

Dr. Rocker opined that Mr. Lopez had an "unlimited or very good" ability to: carry out very short and simple instructions; understand and remember very short and simple instructions; and be aware of normal hazards and take appropriate precautions.  (Tr. 632-33.)

Dr. Rocker opined that Mr. Lopez's impairments or treatment would cause him to be absent three to five days per week.  (Tr. 633.)  When asked how often Mr. Lopez's impairments would cause him to be off task, Dr. Rocker wrote "N/A."  (*Id*.)

### b.    Consultative Examiner – Dr. Reece

On July 13, 2020, Mr. Lopez presented for a telehealth consultative psychological evaluation conducted by John S. Reece, Psy.D. via video.  (Tr. 350-56.)  When asked about the nature of his disability, Mr. Lopez stated that he had anxiety, depression, and problems with his back.  (Tr. 350.)  He reported that he was living with his girlfriend and a daughter and son.  (Tr. 351.)  He reported living with his girlfriend on and off for five years, and described their relationship as "a little bit stressful."  (*Id*.)  He reported a prior significant other relationship that ended after about three or four years.  (*Id*.)  He said he had two daughters, ages 13 and 16, and two sons, ages 7 and 12. (*Id*.)  He reported that his 13-year-old was handicapped and could not

"walk or breathe," his 7-year-old had asthma and was in special education classes, and his 16-year-old was in special education classes.  (*Id.*)

Mr. Lopez reported that he was in special education classes while in school, and quit school in ninth grade because of "moving around."  (Tr. 351.)  He denied behavior problems while in school.  (*Id.*)  He said he got along with teachers, but did not get along with other students because he was teased and picked on by them.  (*Id.*)  He said he had one friend while he was in school and had attendance problems because he did not want to go to school.  (*Id.*)  He reported having no problems with authority figures or his neighbors.  (*Id.*)

Mr. Lopez reported that he was attending outpatient counseling at Family Practice and was prescribed Zoloft by his family doctor.  (Tr. 352.)  He described his mood as "fine" and said he generally felt "emotionally 'calm,'" but said that he wanted to be left alone at times.  (*Id.*)  When depressed, he said he walked, took his medication, and talked to his girlfriend.  (*Id.*)

Mr. Lopez reported problems falling and staying asleep.  (*Id.*)  He said he thought about death a lot, but he did not have suicidal or homicidal thoughts.  (*Id.*)  He reported feeling worthless, hopeless, and helpless.  (*Id.*)  He said his energy level was normal and he did not have mood swings, but he had problems with anxiety and "nervous feelings" when he was around people or thought of the past.  (*Id.*)  He said that he worried "excessively" about his children.  (*Id.*)  He also said that he was easily irritated or angered when he felt ridiculed by others.  (*Id.*)  He reported having anxiety / panic attacks.  (*Id.*)  He said that his significant other and breathing helped calm him down when he was anxious.  (*Id.*)

Mr. Lopez reported no hallucinations or delusional thoughts, but also reported a "generalized suspiciousness of others" and thinking people were "watching him."  (Tr. 352.)  He reported no compulsive behaviors or obsessive thinking, but also reported a "concern for

cleanliness." (*Id*.) He reported a history of childhood abuse and said that he had "intrusive memories and dreams with a theme of trauma and a quality of flashback." (*Id*.)

Mr. Lopez reported a sporadic work history, consisting of odd jobs and temporary work, with his longest reported employment being two weeks. (Tr. 352.) He said he was terminated from a job due to poor performance and also said that he had been out of work for more than a year for childrearing. (*Id*.) He reported that he had some problems following oral instructions. (Tr. 353.) He said he could "slowly perform repetitive tasks." (*Id*.) He denied having problems with coworkers or supervisors, but he stated he would leave work early when he was faced with workplace stress and pressure. (Tr. 352-53.)

Mr. Lopez described his daily activities. (Tr. 353.) He said he took care of his personal needs and cared for his son. (*Id*.) He socialized "minimally to regularly" with his children by phone. (*Id*.) He denied participation in structured social activities and denied having hobbies or interests. (*Id*.) He said that he and his girlfriend did the shopping and cleaning, and his girlfriend did the cooking. (*Id*.)

On mental status examination, Mr. Lopez knew the purpose of the evaluation and was cooperative. (Tr. 353.) His "facial and gestural expressiveness" and tone of voice were normal. (*Id*.) There was no observed "psychomotor retardation or agitation" or "outward signs of anxiety." (*Id*.) He spoke directly with a stammer and was generally understandable. (*Id*.) His "receptive and expressive speech" was unimpaired. (*Id*.) He tended to pause "before responding with an impression of defensiveness." (*Id*.) His associations were well organized. (*Id*.) His affect was constricted and his "prevailing mood was mildly dysphoric to anxious." (*Id*.)

Mr. Lopez was "alert, clear and not confused," and oriented to person, place, situation, and time. (Tr. 353.) His short-term memory was good, but his working memory was poor. (*Id*.)

He was able to complete two out of three basic mental math computations.  (*Id*.)  He used his fingers to count.  (Tr. 354.)  His word knowledge and verbal concept skills and his abstract reasoning ability were poor.  (*Id*.)  His comprehension was fair.  (*Id*.)  His concentration and task persistence were "satisfactory" and his pace of problem solving was "satisfactory to slightly slowed."  (*Id*.)  He reported no problems managing his finances and was assessed as being able to "live independently, make important decisions about his future and seek appropriate community resources."  (*Id*.)  He had adequate insight into his own mental health concerns.  (*Id*.)

Mr. Lopez was diagnosed with unspecified trauma and stressor related disorder and unspecified depressive disorder.  (Tr. 354, 355.)  Dr. Reece stated that Mr. Lopez's "level of intellectual functioning was not established" during the examination, but there were "indications from history and presentation that support[ed] an impression of a lower level of intellectual functioning."  (Tr. 355.)  Dr. Reece opined that Mr. Lopez's "[m]ental illness symptoms have had a mild effect on his workplace history and behavior in the areas of stress tolerance and problems comprehending and retaining instructions," noting that Mr. Lopez "cited mental illness symptoms as part of the reason for his current inability to work," and opined that Mr. Lopez was capable of managing his finances.  (*Id*.)  Dr. Reece provided the following further assessment:

> Claimant's abilities and limitations in understanding, remembering and carrying out instructions
>
> The claimant was able to follow directions in the exam. He reported sometimes having comprehension problems in the past workplace. Borderline intellectual functioning is possible.
>
> Claimant's abilities and limitations in maintaining attention and concentration, and maintaining persistence and pace, to perform simple tasks and to perform multi-step tasks
>
> The claimant had no difficulty with concentration in the exam. He reported focusing problems sometimes in the past workplace.

> <u>Claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting</u>
>
> The claimant reported a history of sustained, but disrupted, interpersonal relationships. He reported no problems in the past workplace.
>
> <u>Claimant's abilities and limitations in responding to work pressures in a work setting</u>
>
> The claimant reported having some social supports. He reported leaving work early to deal with work related stress in the past. Current deficits in dealing with stress and pressure in the workplace are depression and anxiety.

(Tr. 355-56.)

### c.  State Agency Psychological Consultants

On July 22, 2020, state agency psychological consultant Audrey Todd, Ph.D., completed a Psychiatric Review Technique ("PRT") (Tr. 81) and mental RFC assessment (Tr. 84-86).  In the PRT, he opined that Mr. Lopez had moderate limitations in his ability to: understand, remember, or apply information; interact with others; concentration, persist, or maintain pace; and adapt or manage oneself.  (Tr. 81.)  He also opined that Mr. Lopez could: understand, remember, and carry out simple and routine work-related instructions; maintain sufficient concentration, persistence, and pace to complete simple and routine work-related tasks; engage in acceptable superficial interactions with others, including bosses, coworkers, and the general public; and handle the stress and pressure associated with completing simple and routine work-related tasks.  (Tr. 84-85.)

On reconsideration on January 8, 2021, state agency psychological consultant Lisa Foulk, Psy.D., affirmed Dr. Todd's PRT and mental RFC findings.  (Tr. 91-92, 95-96.)  However, Dr. Foulk described Mr. Lopez's adaptation limitations slightly different than Dr. Todd.  (*Compare* Tr. 96 *with* Tr. 85-86.)  Dr. Foulk opined that Mr. Lopez could "adapt and manage himself in a structured work setting with no strict quotas or time constraints" (Tr. 96) whereas Dr. Todd had

opined that Mr. Lopez was "expected to be capable of handling the stress and pressure associated with completing simple and routine work-related tasks" (Tr. 85-86).

C.      **Third-Party Function Report**

Mr. Lopez's girlfriend, Yaritza Sanchez, completed a Third-Party Function Report on August 12, 2021.  (Tr. 233-40.)  She stated that she spent ninety percent of the day with Mr. Lopez doing daily tasks of shopping, cooking, cleaning, and taking care of their son.  (Tr. 233.) However, she also said that she did most of the shopping (Tr. 236) and she was the one that prepared meals because he was never in the mood to cook, or he would not focus and would undercook or overcook food (Tr. 235).  She said Mr. Lopez could not stand or perform any physical work for more than two hours, and that he tossed and turned throughout the night.  (Tr. 233.)  She said his back prevented him from working and caring for his family, and that his inability to do so caused him to be depressed.  (*Id*.)  She said that Mr. Lopez drove his son to and from school and to appointments and made sure that he ate, but she had to push him to do so because his back hurt when driving.  (Tr. 234.)  She said that Mr. Lopez had no problems taking care of his personal care needs, but she noted that she kept an eye on him while he showered to make sure he did not fall.  (*Id*.)

Ms. Sanchez stated that she had to remind Mr. Lopez to do things.  (Tr. 235.)  For instance, she had to remind him to get a haircut because he did not want to leave the house due to his depression and bipolar disorder.  (*Id*.)  She also needed to remind him to take his medication (*id.*) and they created a calendar to remind him about doctor appointments (Tr. 237).  She reported that Mr. Lopez helped with household chores and yardwork, but she said that he could not take care of things without her help, and it could take them two to three hours depending on how Mr. Lopez felt that day.  (Tr. 235.)  She reported that they had disagreements at times

because Mr. Lopez could not accept that he could not do things on his own.  (*Id.*)  She reported
that Mr. Lopez had problems getting along with other people, stating that "his social skill[s]
[were] not like they use[d] to be" (Tr. 236), and he preferred to be alone (Tr. 238).  She said he
was confrontational with authority figures.  (Tr. 239.)  She said he did not go outside often.  (Tr.
236.)  He could go out alone and drive himself, but only for short periods of time.  (*Id.*)  He
could use the computer to shop.  (*Id.*)  He could handle money on his own, but it took him a little
longer to handle money because he would get overwhelmed.  (*Id.*)

As far as hobbies or interests, Ms. Sanchez reported that Mr. Lopez watched television
for a few hours a day, but said he had to alternate between sitting, standing, and lying down
because he could not stay in the same position.  (Tr. 237.)  Ms. Sanchez also said Mr. Lopez
could lift twenty-five to thirty pounds and walk one-half a mile.  (Tr. 238.)  He would need to
take a five-minute rest after walking for ten minutes and could sit and stand for no longer than
one hour.  (*Id.*)  He could not focus or follow written instructions and did not follow spoken
instructions well.  (*Id.*)  He did not handle stress or changes in routine well, and Ms. Sanchez
noticed him being more irritated and having anxiety.  (Tr. 239.)

D.     **Hearing Testimony**

1.     **Plaintiff's Testimony**

Mr. Lopez testified in response to questioning by the ALJ and his representative at the
August 19, 2021 telephonic hearing.  (Tr. 42-65.)  He provided testimony regarding his past
work experience.  (Tr. 43-48.)  He said that the longest he worked at a job was only one to two
months due to his back problems.  (Tr. 47-48.)

His back pain was horrible and made him miserable and had led to anxiety and
depression.  (Tr. 49, 51, 55, 59, 60-61.)  His pain used to be only in his back, but had started

going into his right leg.  (Tr. 54, 59.)  He said he could not sit or stand without being in pain.  (Tr. 49.)  He estimated being able to sit for fifteen to twenty minutes before needing to stand up, and then he would stand and wait for the pain to subside.  (Tr. 49-50.)  He would then try to sit down or lie on the floor.  (Tr. 50, 58.)  He could stand between fifteen to twenty-five minutes.  (Tr. 50, 51.)  When asked about his ability to put on socks and shoes, he reported that he only wore flip flops because it was easy for him.  (Tr. 64.)

Mr. Lopez said he was not the same person mentally that he was before his back pain.  (Tr. 56.)  He used to be a happy person, but now had bipolar disorder, mood swings, and anxiety.  (Tr. 56-57.)  He could not focus.  (*Id.*)  He "hate[d] everything" and was depressed because he was a man who could not hold a job and support his family.  (Tr. 57.)  His conditions negatively impacted his relationship with his girlfriend and children.  (Tr. 60.)  He might have one or two "good" days per week, and explained that a "good day" meant being without pain for about four hours.  (Tr. 56, 59-60.)  He reported seeing his psychologist three times each week; he had been seeing her once per week, but said he had started to see her more frequently because she told him he needed to calm down.  (Tr. 64.)

As far as treatment for his back pain, Mr. Lopez said that he attended therapy three days a week, and his doctor had recently recommended injections in his back.  (Tr. 52-53, 54, 59.)  He said they also discussed the possibility of surgically inserting a device in his back to address his pain.  (Tr. 52-53, 59.)

Mr. Lopez also reported having asthma and being hospitalized once for seven days for pneumonia.  (Tr. 63.)  He said that heat and cold were triggers for his asthma, and he used an inhaler and breathing machine for his asthma.  (63-64.)

Mr. Lopez performed some light chores (Tr. 62), but said that his girlfriend took care of most things because he could not lift or carry things (Tr. 52, 55-56).  For instance, his girlfriend had to the carry the shopping bags and if something had to be moved, his girlfriend would move it with his son.  (Tr. 52.)  He said he was weak and tired, and his back was always hurting.  (Tr. 56.)  He reported problems sleeping.  (Tr. 50.)  He said that it was difficult for him to be in car, explaining that they took a trip once, and they had to stop because his back was hurting.  (Tr. 49.)  When he had a recent MRI, he said "they had to stop the machine because [he] was going to freak out," thinking that his back was going to hurt.  (Tr. 49, 58-59.)  He reported that his medication made him drowsy and gave him nightmares.  (Tr. 63.)  He could not go to the movie theater because he could not stay seated and would have to get up and walk around.  (Tr. 58.)  He did not go places and did not "want to deal with people."  (Tr. 62.)

### 2.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 65-71.)  The VE testified that Mr. Lopez's past work as a glass installer was classified as a semi-skilled, medium job, performed by Mr. Lopez at the light level.  (Tr. 66.)  The VE also testified that a hypothetical individual of Mr. Lopez's age, education and work experience and with the functional limitations described in the ALJ's RFC determination (Tr. 23, 66-67, 69-70) could not perform Mr. Lopez's prior work (Tr. 67), but could perform representative positions in the national economy, including merchandise marker, sorter, and routing clerk (Tr. 67-68, 70).

The VE testified that, if the hypothetical individual described in the ALJ's RFC could stand for twenty minutes at a time for a total of two hours in an eight-hour workday, walk for two hours at a time for a total of eight hours in a workday, and sit for six hours, the individual

could still perform the jobs previously identified, with a reduction in the job incidence numbers, provided that the individual was not off task while changing positions.  (Tr. 68-70.)

The VE testified that employers generally would not tolerate an individual being off task 10% or more of the time.  (Tr. 70.)  The VE also testified that an employer would generally not tolerate an individual missing one day or more per month beyond sick or vacation time or, having no more than ten such absences in a year.  (*Id*.)  Further, the VE stated that an individual would be subject to dismissal if he missed one day within a ninety-day probationary period.  (*Id*.) Finally, the VE testified that there would be no competitive employment for an individual if he would only be able to: stand and walk for a total of less than two hours in an eight-hour workday and sit for less than two hours in an eight-hour workday.  (Tr. 70-71.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.      If the claimant is doing substantial gainful activity, he is not disabled.

2.      If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.      The ALJ's Decision

In her September 1, 2021 decision, the ALJ made the following findings:[4]

1.      The claimant has not engaged in substantial gainful activity since February 11, 2020, the application date.  (Tr. 18-19.)

2.      The claimant has the following severe impairments: lumbar spondylosis and facet arthritis and radiculopathy, asthma, depressive disorder, trauma/stressor related disorder, bipolar disorder, generalized anxiety disorder, attention deficit hyperactivity disorder (ADHD), and obsessive-compulsive disorder.  (Tr. 19.)

---

[4] The ALJ's findings are summarized.

26

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 19-23.)

4.    The claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except he can frequently climb ramps and stairs, kneel, crouch, and crawl, and occasionally stoop; he should never climb ladders, ropes, and scaffolds; he should avoid concentrated exposure to extreme cold, extreme heat, humidity as well as dust, odors, fumes, and pulmonary irritants; he should never be exposed to unprotected heights, dangerous moving mechanical parts, or operate a motor vehicle; he has the ability to carry out, concentrate, persist, and maintain pace for completing simple, routine, repetitive tasks, however, there should be no strict quotas or time constraints; he can superficially interact with supervisors, coworkers, and the public, with superficial interaction defined as work that does not involve any work tasks, such as arbitration, negotiation, confrontation, being responsible for the safety of others, or directing the work of others.  (Tr. 23-31.)

5.    The claimant is unable to perform any past relevant work.  (Tr. 31.)

6.    The claimant was born in 1972 and was 48 years old, defined as a younger individual age 18-49, on the date the application was filed.  (*Id*.)

7.    The claimant has at least a high school education.  (*Id*.)

8.    Transferability of job skills is not material to the determination of disability.  (*Id*.)

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including merchandise marker, sorter, and routing clerk.  (Tr. 31-32.)

Based on the foregoing, the ALJ determined that Mr. Lopez had not been under a disability, as defined in the Social Security Act, since February 11, 2020, the date the application was filed.  (Tr. 33.)

## V.    Plaintiff's Arguments

Mr. Lopez presents three assignments of error.  First, he argues that the ALJ erred in evaluating the opinions of his treating sources—Drs. Goyal and Rocker—and by failing to

incorporate their opined limitations into the RFC.  (ECF Doc. 9, pp. 1, 7-14.)  Second, he argues that ALJ erred by modifying the definition of superficial interaction.  (*Id*. at pp. 1, 14-15.)  Third, he argues the ALJ erred in evaluating his subjective symptoms.  (*Id*. at pp. 1, 15-20.)

## VI.     Law & Analysis

### A.     Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide

28

questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if

substantial evidence supports a claimant's position, a reviewing court cannot overturn the

Commissioner's decision "so long as substantial evidence also supports the conclusion reached

by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit

has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to

follow its own regulations and where that error prejudices a claimant on the merits or deprives

the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651

(6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not

be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge

between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio

2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.**     **First Assignment of Error: Whether ALJ Properly Evaluated Persuasiveness of the Opinions of Plaintiff's Treating Sources**

Mr. Lopez argues that the ALJ erred when she failed to find that the opinions of Dr.

Goyal and Dr. Rocker were consistent with and supported by the medial evidence and failed to

incorporate their stated limitations into her RFC assessment.  (ECF Doc. 9, pp. 7-14.)  The

Commissioner responds that the ALJ complied with the regulations when evaluating the

persuasiveness of the opinion evidence, set forth specific rationale for finding the opinions of

Drs. Goyal and Rocker not persuasive, and that those findings are supported by substantial

evidence.  (ECF Doc. 11, pp. 15-19.)

### 1.    Legal Framework for Evaluation of Medical Opinion Evidence

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 416.920c(a); *see Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at \*2 (N.D. Ohio Apr. 8, 2020).  The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors.  20 C.F.R. § 416.920c(c)(1)-(5).  The most important factors are supportability and consistency.  20 C.F.R. §§ 416.920c(a), 416.920c(b)(2).  ALJs must explain how they considered consistency and supportability, but need not explain how they considered the other factors.  20 C.F.R. § 416.920c(b)(2).

As to supportability, the regulations state: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 416.920c(c)(1).  In other words, "supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 416.920c(c)(2).  In other words, "consistency" is the extent to which a medical source's opinion findings are consistent with evidence from other medical and nonmedical sources in the record.

The undersigned turns to whether the ALJ's evaluation of the challenged medical opinions satisfied the regulatory framework for evaluation of medical opinion evidence.

## 2. Whether ALJ Properly Evaluated Opinion of Dr. Goyal

The ALJ evaluated the persuasiveness of Dr. Goyal's opinion as follows:

> In addition, the undersigned considered a Spine Medical Source Statement signed by Kush Goyal, M.D. on August 17, 2021 []. He noted an initial visit on November 17, 2020, and diagnoses of chronic back pain, lumbar spondylosis, and lumbar radiculopathy and objective signs included reduced range of motion in lumbar extension, tenderness, muscle spasm, impaired appetite or gastritis, and impaired sleep. The claimant's treatment plan has included medication that causes drowsiness. Dr. Goyal opined the claimant could walk three city blocks without rest or severe pain, sit 10 minutes at one time, stand 20 minutes at one time before needing to sit down or walk around, and sit, stand/walk less than two hours total in an eight-hour workday. He would need a job that permits shifting positions at will from sitting, standing, or walking. He would need to take unscheduled breaks every 10 minutes for 10 minutes. He does not need to elevated legs or use a cane or other assistive device. He could occasionally lift and carry 20 pounds or less occasionally, rarely 50 pounds, and rarely twist, stoop (bend), crouch/squat, and climb ladders or stairs. Dr. Goyal further opined the claimant would be off task 25% or more of a typical workday, absent about two days per month, and impairments likely produce good days and bad days. He would be capable of low stress work due to anxiety and depression.
>
> The undersigned finds this opinion unpersuasive based on the limited frequency and duration of treatment starting with an initial consultation on November 17, 2020, and an office visit February 16, 2021 []. Dr. Goyal's opinion is also inconsistent with testing that showed mild spondylosis []. Dr. Goyal's noted reduced range of motion with lumbar extension but measurements showed this as within normal limits and flexion with reduced range of motion (Ex. 7F/14). The claimant's overall conservative course of treatment, including physical therapy and injections with no recommendation for surgery or spinal cord stimulator as well as examinations that showed typically full strength and intact sensation also do not support Dr. Goyal's opinion [].

(Tr. 30 (internal citations omitted) (emphasis added).)

Mr. Lopez argues that this persuasiveness finding was harmful error because "[c]ontrary to the ALJ's conclusion, the opinion of Dr. Goyal was supported by and consistent with" Mr. Lopez's August 2021 physical examination and MRI, and "was also consistent with and

supported by additional medical records in the file."  (ECF Doc. 9, pp. 9-11.)  The "additional records" cited by Mr. Lopez include records documenting his subjective complaints to medical providers, his attendance at physical therapy sessions and treatment by a chiropractor, and a lumbar x-ray taken on November 17, 2020, showing lumbar spondylosis.  (*Id*. at pp. 10-11.)

To the extent Mr. Lopez is arguing that the ALJ erred because there is evidence that supports and/or is consistent with Dr. Goyal's opinion, that is not the legal standard.  Even if a preponderance of the evidence supports a finding that Dr. Goyal's opinion is persuasive, this Court cannot overturn the ALJ's finding to the contrary "so long as substantial evidence also support[ed] the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477; *Blakley*, 581 F.3d at 406.  Thus, regardless of whether there was evidence to support a finding that the limitations outlined in Dr. Goyal's opinion were persuasive, the question before this Court is whether there was substantial evidence in the record to support the ALJ's finding to the contrary.

Here, the ALJ explained that she found Dr. Goyal's opinion unpersuasive for multiple reasons.  First, she noted that Dr. Goyal's treatment was of "limited frequency and duration." (Tr. 30.)  This finding is supported by the record, where the only office visit notes for treatment by Dr. Goyal cited by the parties are those from the initial consultation on November 17, 2020. (Tr. 416-21.)  The ALJ references a second office visit with Dr. Goyal on February 16, 2021 (Tr. 30), but the only identified record for this visit is a "Plan of Care" document listing it as an upcoming office visit (Tr. 430).  Neither party has identified a document containing findings from a February 2021 visit.  Even if there was a second office visit in February 2021, the ALJ's conclusion that Dr. Goyal's treatment relationship with Mr. Lopez was limited in frequency and duration was supported by substantial evidence and Mr. Lopez has not demonstrated otherwise.

Second, the ALJ found the explanation in Dr. Goyal's opinion did not match his own examination findings, as his opinion relied on a "reduced range of motion with lumbar *extension*" but his November 2020 examination findings "showed [extension] as within normal limits and *flexion* with reduced range of motion."  (Tr. 30 (citing Tr. 419) (emphasis added).)  Mr. Lopez does not address this stated reasoning, and the Court finds the reasoning has the support of substantial evidence.  An ALJ should consider the "supporting explanations presented by a medical source" in assessing the persuasiveness of the source's opinion.  20 C.F.R. § 416.920c(c)(1).  Thus, the ALJ's observation that Dr. Goyal's supporting explanation did not match his examination findings was appropriate and supported by substantial evidence.

Third, the ALJ found that Dr. Goyal's limitations were not consistent with objective testing that showed mild spondylosis, a conservative course of treatment, and examination findings that generally showed full strength and intact sensation.  (Tr. 30.)  Mr. Lopez does not directly challenge these observations or characterizations of the record, and an independent review by this Court does not suggest that the ALJ's findings were in error.

Instead, Mr. Lopez simply argues—as discussed above—that Dr. Goyal's opinion was supported by and consistent with other evidence in the record, including an August 2021 MRI, physical examination findings from August 2021, a November 2020 x-ray, subjective complaints to providers, and physical therapy and chiropractic treatment.  (*Id.* at pp. 10-11.)  But a review of the decision reveals that the ALJ considered the August 2021 MRI (Tr. 26), the November 2020 x-ray (*id.*), and Mr. Lopez's subjective complaints and course of treatment, including physical therapy and chiropractic treatment (Tr. 25-26).  Mr. Lopez has failed to explain how the evidence he highlights serves to prove that the ALJ's persuasiveness finding lacked the support of substantial evidence, or how the ALJ failed to sufficiently articulate her findings.

For the reasons stated above, the undersigned finds Mr. Lopez has not met his burden to show that the ALJ failed to consider the entire record when evaluating the persuasiveness of Dr. Goyal's opinion, that she failed to sufficiently articulate her reasons for finding the opinion unpersuasive, or that her persuasiveness finding lacked the support of substantial evidence.

### 3. Whether ALJ Properly Evaluated Opinion of Dr. Rocker

The ALJ evaluated the persuasiveness of Dr. Rocker's opinion as follows:

> Laura Rocker, M.D. completed a Mental Impairment Questionnaire dated July 28, 2021, and identified diagnoses of Bipolar II Disorder and Generalized Anxiety treated with Sertraline, Wellbutrin, and Seroquel []. She noted no side effects, clinical findings of severe anxiety, mood lability, and irritability, and a fair, guarded prognosis. Regarding the area of Sustained Concentration and Persistence Limitations, Dr. Rocker opined primarily a degree of seriously limited, but not precluded, except for a degree of unable to meet competitive standards in the sub-area of complete a normal workday and workweek without interruptions from psychologically based symptoms. The Understand and Memory Limitations area involved a degree ranging from unlimited to limited but satisfactory. The Social Interaction Limitations area consisted of a degree ranging from seriously limited, but not precluded, to unable to meet competitive standards for interaction with supervisors, coworkers, or peers. The degree of Adaptation Limitations ranged from unlimited to seriously limited, but not precluded. Dr. Rocker also opined the claimant would be absent from work three to five days per week due to his impairments or treatment.
>
> The undersigned finds this opinion unpersuasive. The undersigned notes Dr. Rocker's duration of treatment as the claimant's mental health provider monthly or bi-monthly; however, Dr. Rocker's opinion consisted primarily of checked boxes and no explanation or remarks. In addition, the undersigned finds the record does not support the degree of limitations provided on the Questionnaire. Medication dosage increases resulted in improvement and stability as demonstrated by a diagnosis of mild or partial remission in addition to reports of benefit from medication and therapy []. In addition, examinations showed some issues with mood but otherwise generally intact functioning []. Examinations from visits with Dr. Rocker indicated the claimant presented as well groomed with cooperative behavior, good eye contact, euthymic mood, at times depressed, but full range of affect, normal speech, no ideations or perceptual disturbances, and good judgment [].

(Tr. 29-30 (internal citations omitted) (emphasis added).)

Mr. Lopez argues that this persuasiveness finding "was in error and not supported by substantial evidence" because Dr. Rocker's opinion "was supported by and consistent with the examinations by Dr. Rocker," as well as Mr. Lopez's "rambling" hearing testimony and his subjective complaints at a November 2020 behavioral health appointment.  (ECF Doc. 9, p. 12.) He also asserts that certain limitations described by consultative examiner Dr. Reece "correlated with the opinion set forth by Dr. Rocker."  (*Id*. at pp. 12-13.)

As discussed above, Mr. Lopez's argument that the ALJ erred because certain evidence supports or is consistent with Dr. Rocker's opinion does not state the applicable legal standard. Even if a preponderance of the evidence supports a finding that Dr. Rocker's opinion is persuasive, the question in this case is whether there was substantial evidence in the record to support the ALJ's finding to the contrary.  *See Jones*, 336 F.3d at 477; *Blakley*, 581 F.3d at 406.

Here, the ALJ explained that she found Dr. Rocker's opinion unpersuasive for multiple reasons.  First, she observed that the opinion "consisted primarily of checked boxes and no explanation or remarks." (Tr. 30.)  Mr. Lopez does not contend that this was an improper basis to find the opinion unpersuasive, and courts recognize that it is appropriate for an ALJ to find that a check-box format undermines the persuasiveness of a medical opinion.  *See Ellars v. Commissioner of Soc. Sec.*, 647 F. App'x 563, 566–67 (6th Cir. 2016) (collecting cases).

Second, the ALJ found the opinion unpersuasive because the record did not support the degree of limitations set forth in Dr. Rocker's opinion.  (Tr. 30.)  By way of example, the ALJ pointed to: Mr. Lopez's positive response to medication and therapy; examinations showing some issues with mood, but generally intact functioning; and normal examination findings recorded by Dr. Rocker during Mr. Lopez's visits with her.  (*Id*.)  Mr. Lopez does not directly

challenge these observations or characterizations of the record, and an independent review of the record by this Court does not suggest that the ALJ's stated findings were in error.

Instead, Mr. Lopez argues that: (1) certain specified evidence supported and was consistent with Dr. Rocker's opinion; and (2) the limitations stated in the opinion of consultative examiner Dr. Reece "correlated with the opinion set forth by Dr. Rocker" and the ALJ "erroneously concluded that Dr. Reece did not 'provide an opinion regarding specific functional capabilities and limitations.'"  (ECF Doc. 9, pp. 12-13 (quoting Tr. 29).)  The Court will address each of Mr. Lopez's developed arguments in turn.[5]

As to the first contention—that Dr. Rocker's opinion was supported by and consistent with specified evidence—a review of the decision reveals that the ALJ discussed: Mr. Lopez's November 2020 behavioral health telephone visit, where he reported a depressed and irritated mood (Tr. 26); the December 2020 psychiatric evaluation where Dr. Rocker noted his variable mood, irritability, OCD and ADD symptoms and diagnosed "Major depression, mild" (Tr. 27); the January 2021 assessment where he was found to be in "partial remission" (*id.*);  his March 2021 complaint of not sleeping well (*id.*); and various medication adjustments (*id.*).  Thus, the record reflects that the ALJ considered the same evidence highlighted in Mr. Lopez's brief.  Mr. Lopez fails to explain how that evidence demonstrates that the ALJ's persuasiveness findings lacked the support of substantial evidence, or how the ALJ failed to articulate her findings.

Mr. Lopez's characterization of his hearing testimony as "rambling," and his assertion that this "provided support for Dr. Rocker's opinion," does not change the analysis.  (ECF Doc. 9, p. 12.)  There is no question that the ALJ attended the hearing and was present for the testimony.  She was not obligated to specifically discuss his testimony "so long as [she]

---

[5] To the extent Mr. Lopez intended to separately challenge the persuasiveness finding as to Dr. Reece, the Court finds the argument underdeveloped and waived.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997).

consider[ed] the evidence as a whole and reach[ed] a reasoned conclusion." *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006)).  Mr. Lopez has not shown that the ALJ's failure to address that testimony deprived her of substantial evidence to support her decision.

The Court therefore turns to Mr. Lopez's second contention—that "the ALJ erroneously concluded that Dr. Reece did not 'provide an opinion regarding specific functional capabilities and limitations,'" when in fact "Dr. Reece's opined limitations correlated with the opinion set forth by Dr. Rocker."  (ECF Doc. 9, pp. 12-14.)  In assessing the persuasiveness of Dr. Reece's psychological consultative evaluation, the ALJ explained:

> John Reece, Psy.D. conducted a psychological consultative evaluation on July 13, 2020, and provided a diagnoses of Unspecified Trauma and Stressor-Related Disorder and Unspecified Depressive Disorder []. For the Functional Assessment, Dr. Reece noted the claimant was able to follow directions in the exam, reported sometimes having comprehension problems in the past workplace, and possible borderline intellectual functioning. The claimant had no difficulty with concentration in the exam but reported focusing problems sometimes in the past workplace. The claimant reported a history of sustained but disrupted, interpersonal relationships and no problems in the past workplace, and he reported having some social supports and leaving work early to deal with work-related stress in the past. Current deficits in dealing with stress and pressure in the workplace are depression and anxiety. The undersigned finds this opinion somewhat persuasive because it is consistent with the claimant's performance during the evaluation as well as overall treatment records for mental health symptoms consisting of outpatient medication management and therapy []. However, the undersigned finds Dr. Reece did not provide an opinion regarding specific functional capabilities and limitations and primarily referenced the claimant's own reports.

(Tr. 29 (internal citations omitted) (emphasis added).)

In arguing the ALJ erred in finding "Dr. Reece did not provide an opinion regarding specific functional capabilities and limitations," Mr. Lopez highlights clinical findings from his mental status examination, his diagnoses, and Dr. Reece's finding that Mr. Lopez's "[m]ental illness symptoms have had a mild effect on his workplace history and behavior" in specified areas.  (ECF Doc. 9, pp. 12-13 (citing Tr. 29, 353-55).)  A review of the ALJ decision reveals

that the ALJ referenced and discussed Mr. Lopez's mental status findings in the consultative examination, as well as his subjective reports to Dr. Reece and Dr. Reece's diagnoses.  (Tr. 22, 27-28, 29 (citing 3F).)  Regardless of whether the ALJ specifically quoted Dr. Reece's finding that Mr. Lopez's symptoms "had a mild effect on his workplace history and behavior," the Court finds no error in the ALJ's determination that Dr. Reece's opinion—including the finding of a "mild effect"—failed to identify "specific functional capabilities and limitations" and "primarily referenced [Mr. Lopez]'s own reports."  Further, Mr. Lopez has failed to explain how any consideration of Dr. Reece's opinion regarding the "mild effect" on his behavior shows that the ALJ's persuasiveness findings as to Dr. Rocker lacked the support of substantial evidence.

For the reasons stated above, the Court finds Mr. Lopez has not met his burden to show that the ALJ failed to consider the entire record when evaluating the persuasiveness of Dr. Rocker's opinion, that she failed to sufficiently articulate her reasons for finding the opinion unpersuasive, or that her persuasiveness finding lacked the support of substantial evidence. Accordingly, the Court finds Mr. Lopez's first assignment of error to be without merit.

## C.     Second Assignment of Error: Whether ALJ Improperly Modified Definition of Superficial Interaction

In his second assignment of error, Mr. Lopez argues that the ALJ erred when she modified the definition of superficial interaction.  (ECF Doc. 9, pp. 1, 14-15.)  The Commissioner responds that Mr. Lopez has failed to show that the ALJ improperly defined the word superficial.  (ECF Doc. 11, pp. 19-20.)

An ALJ is charged with assessing a claimant's RFC "based on all the relevant evidence in [the] case record."  20 C.F.R. § 416.945(a)(1); *see also* 20 C.F.R. § 416.9546(c) "(If your case is at the administrative law judge hearing level . . ., the administrative law judge . . . is responsible for assessing your residual functional capacity.");  *Poe v. Comm'r of Soc. Sec.*, 342

Fed. App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician.").

Here, among the medical opinions that the ALJ found persuasive, were the medical opinions of the state agency psychological consultants who opined that Mr. Lopez had the residual functional capacity to engage in superficial interactions with others, including bosses, coworkers, and the general public.  (Tr. 29, 85, 95.)  The ALJ incorporated this limitation into the RFC with clarification that "superficial interaction" was defined as "work that does not involve any work tasks, such as arbitration, negotiation, confrontation, being responsible for the safety of others, or directing the work of others."  (Tr. 23.)

Mr. Lopez argues that the ALJ "erroneously expanded the definition of superficial," asserting that the term "superficial contact goes to the quality of interactions" and "reasonably encompasses a prohibition against interactions that go beyond brief interactions."  (ECF Doc. 9, p. 14 (relying on *Hutton v. Comm'r of Soc. Sec.*, No. 2:20cv339, 2020 WL 3866855, at *4 (S.D. Ohio July 9, 2020) and *Metz v. Kijakazi*, No. 1:20cv2202, 2022 WL 4465699, at *9 (N.D. Ohio Sept. 26, 2022)).)

This Court has previously explained that the term "superficial" is not defined in the governing regulations.  *See Stoodt v. Comm'r of Soc. Sec.*, No. 3:20-CV-02370, 2022 WL 721455, at *16 (N.D. Ohio Jan. 13, 2022), *report and recommendation adopted sub nom. Stoodt v. Comm'r of Soc. Sec.*, No. 3:20-CV-2370, 2022 WL 716105 (N.D. Ohio Mar. 10, 2022); *Beulah v. Comm'r of Soc. Sec. Admin.*, No. 1:20-CV-02271, 2022 WL 1609236, at *29 (N.D. Ohio Mar. 25, 2022), *report and recommendation adopted sub nom. Beulah v. Kijakazi*, No. 1:20-CV-02271, 2022 WL 1606286 (N.D. Ohio May 20, 2022); *accord Betz v. Comm'r of Soc. Sec.*, No. 3:21-CV-2408, 2022 WL 17717496, at *10 (N.D. Ohio Nov. 8, 2022) (agreeing that

"[t]he term 'superficial interaction' is not defined under the Dictionary of Occupational Titles ("DOT") or Selected Characteristics of Occupations ("SCO")"), *report and recommendation adopted*, No. 3:21 CV 2408, 2022 WL 17985680 (N.D. Ohio Dec. 29, 2022).

Dictionary definitions do not provide clarity as to what work-related interactions would be included or excluded by a limitation to "superficial" interactions.  *See, e.g.,* "Superficial." *Merriam-Webster's Unabridged Dictionary, Merriam-Webster*, https://unabridged.merriam-webster.com/unabridged/superficial. Accessed 11 Apr. 2024 ("not penetrating beneath or farther than the easily or quickly apprehended features of a thing: concerned only with the obvious or apparent"; "lacking in depth or substantial qualities: not profound"; "presenting only an appearance or a semblance: not far-reaching, significant, or genuine").

Notably, SSA guidance states that VE testimony "generally should be consistent with the occupational information supplied by the DOT."  SSR 00-4p, *Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Info. in Disability Decisions*, 2000 WL 1898704, *2 (Dec. 4, 2000).  And the Commissioner's internal manual instructs ALJs "not [to] permit the VE to respond to questions on medical matters or to draw conclusions not within the VE's area of expertise."  HALLEX I-2-6-74(C); *see also Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 399 (6th Cir. 2008) (finding HALLEX is "not binding on this court" but is persuasive authority).  Where a VE has based testimony "on an assumption," the manual requires the ALJ to "ask the VE to clearly describe the assumption on the record."  *Id.*

Since "superficial" is not a defined term under the DOT or SCO, and it's meaning in the vocational context is not otherwise clearly defined for purposes of VE testimony, SSR 00-4p and Social Security's internal manual indicate that it was appropriate for the ALJ to specifically identify the assumptions the VE should make in defining the term "superficial" for purposes of

the RFC.  Neither case cited by Mr. Lopez stands for the proposition that an ALJ may not specifically define the RFC limitations.  On the contrary, reframing of limitations in medical opinions for clarity, sometimes described as "convert[ing]" limitations "into vocationally relevant terms in [a claimant's] RFC," is not improper.  *See Modro v. Comm'r of Soc. Sec.*, No. 2:18-CV-900, 2019 WL 1986522, at *7 (S.D. Ohio May 6, 2019) (finding ALJ "reasonably converted and incorporated" medical opinions given great weight "into vocationally relevant terms in Plaintiff's RFC"), *report and recommendation adopted*, No. 2:18-CV-900, 2019 WL 2437296 (S.D. Ohio June 11, 2019); *see also Betz*, 2022 WL 17717496, at *11-12 (finding ALJ reasonably defined "superficial contact" as "'no tasks involving arbitration, negotiation, confrontation, directing the work of others, persuading others or being responsible for the safety or welfare of others'").

Even assuming *arguendo* that "superficial contact goes to the quality of interactions," (ECF Doc. 9, p. 14), Mr. Lopez fails to explain how the ALJ's definition of "superficial interaction" does not address the "quality" of interactions Mr. Lopez could engage in.

For the reasons set forth above, the Court finds Mr. Lopez has failed to show that the ALJ erred in defining the limitation to superficial interaction as specified in the RFC.  Accordingly, the Court finds Mr. Lopez's second assignment of error to be without merit.

**D.    Third Assignment of Error: Whether ALJ Properly Considered Subjective Symptoms**

In his third assignment of error, Mr. Lopez argues that the ALJ erred in her evaluation of his subjective symptoms because she should have found that the intensity, persistence, and limiting effects of Mr. Lopez's symptoms, including his pain, precluded him from engaging in substantial gainful activity on a full-time sustained basis.  (ECF Doc. 9, pp. 15-20.)  Mr. Lopez also contends the ALJ "failed to articulate any supportable rationale" for finding his statements

not entirely consistent with the record.  (*Id*.)  The Commissioner responds that the ALJ provided sufficient and detailed rational for finding Mr. Lopez's subjective complaints not entirely consistent with the record and the ALJ's evaluation of Mr. Lopez's subjective complaints was supported by substantial evidence.  (ECF Doc. 11, pp. 20-25.)

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's symptoms.  *See* SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)).  If that requirement is met, the second step is to evaluate the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  *See* SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers,* 486 F.3d at 247.  There is no dispute that the first step is met in this case (Tr. 24), so the discussion will be focused on the ALJ's compliance with the second step.  When the alleged symptom is pain, an ALJ should evaluate the severity of the alleged pain in light of all relevant evidence, including the factors set out in 20 C.F.R. § 416.929(c).  *See Felisky v. Bowen*, 35 F.3d 1027, 1038–39 (6th Cir. 1994).  Those factors include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms. *See* SSR 16-3p, 82 Fed. Reg. 49462, 49465-49466; 20 C.F.R. § 416.929(c)(3).

Here, the ALJ considered Mr. Lopez's allegations that he could not work due to the combination of the symptoms caused by his physical and mental impairments, including pain which he reported made it difficult for him to sit, stand, lift, and sleep and also affected his appetite and made him miserable and unable to get comfortable.  (Tr. 24.)  Nevertheless, she

42

found that Mr. Lopez's "statements concerning the intensity, persistence and limiting effects of th[o]se symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (*Id.*)  Mr. Lopez contends that "[his] testimony, [Ms. Sanchez's] Third-Party Function Report, and medical evidence . . . provided evidence regarding the intensity, persistence and limiting effects of [his] symptoms along with the limited nature of his daily activities and the difficulties he had" (ECF Doc. 9, p. 18) and that the ALJ failed to "articulate any supportable rationale for her finding that [his] statements and the evidence . . . were not supportive of the fact that he would be precluded from all types of work" (*id* at p. 19).

Mr. Lopez recites evidence that he contends supports his claim that his impairments caused symptoms that were wholly disabling and prevented him from working.  (ECF Doc. 9, pp. 15-19.)  That evidence includes his own testimony, which he characterizes as "rambling," his girlfriend's third-party function report, the medical records, and certain opinion evidence. (*Id.*) The ALJ, however, heard Mr. Lopez's testimony firsthand and acknowledged and discussed the testimony, third-party function report, medical records, and opinion evidence.  (Tr. 24-31.)  The Court finds that Mr. Lopez has not met his burden to show how the ALJ's analysis of his subjective complaints failed to meet the regulatory standard.  Nor has he shown that the ALJ failed to provide a reasoned rationale for finding Mr. Lopez's subjective statements not entirely consistent with the medical evidence and other evidence of record.

A review of the decision reveals that the ALJ considered evidence of Mr. Lopez's musculoskeletal impairments, neuropathy, and asthma, including his diagnoses, course of treatment, medications, response to treatment, generally normal examination findings, and objective imaging results.  (Tr. 24-26.)  The ALJ also considered evidence of Mr. Lopez's mental impairments, including his diagnoses, treatment and response to treatment and

medications, and his presentation during mental status examinations.  (Tr. 26-27.)  The ALJ considered and weighed the medical opinion evidence (Tr. 28-30) and Mr. Lopez's girlfriend's function report (Tr. 30-31).  The ALJ also considered Mr. Lopez's daily activities, including his ability to perform household tasks, prepare meals, attend to personal care tasks, care for his son, drive, and handle his own finances.  (Tr. 22, 28.)  Considering the evidence of record, the ALJ found the objective evidence failed to fully support Mr. Lopez's alleged limitations, explaining:

> The objective evidence showed the claimant followed a conservative course of treatment that provided stability and improvement in symptoms and in turn[] does [] not support limitations that would preclude the residual functional capacity set forth in this decision. The claimant experienced stability, improvement, and intact physical functioning confirmed by progress notes, examinations, and testing results []. The record included no evidence of extended inpatient stays, repeated emergency department visits, invasive procedures, surgical evaluations or recommendations, or extensive physician interventions. Examinations indicated the claimant generally presented as well developed with lungs clear to auscultation, no wheezes, regular heart rate and rhythm, no extremity edema, no neurological deficits, intact sensation, equal and symmetric reflexes, 5/5 strength, and normal extremity range of motion []. He also maintained normal gait and required no assistive device.
>
> In addition, despite symptoms from mental impairments, the record included evidence of conservative course of treatment that consisted of counseling and pharmacologic management []. The claimant's treatment plan provided stability, and he did not require extensive psychiatric hospital stays or alternative treatments for exacerbations of symptoms. The claimant provide[d] information, answered questions, and understood treatment plans with various providers, including a medication regimen, physical therapy, and home exercise program []. He routinely presented on examination as oriented and cooperative []. He generally showed organized thought process, no abnormal thought content, sustained attention and concentration, intact recent and remote memory, and sufficient cognitive functioning []. Further, the claimant handles his personal needs independently, takes care of children, drives, and handles finances [].

(Tr. 27-28 (internal citations omitted).)

Thus, consistent with the regulations, the ALJ considered the types and effectiveness of medications, course of treatment and response to treatment, activities of daily living, objective imaging and objective examination findings, and other evidence of record when assessing the

consistency of Mr. Lopez's subjective statements.  Mr. Lopez has not shown that the ALJ failed
to consider evidence or that her findings lack the support of substantial evidence.  He simply
disagrees with the ALJ's weighing of the evidence and, contrary to Mr. Lopez's contention, the
ALJ did not "[f]ail[] to account for [Mr. Lopez's] pain in forming the RFC" (ECF Doc. 9, p. 19).

Importantly, the ALJ did not find that Mr. Lopez's subjective statements regarding his
symptoms were wholly inconsistent with evidence of record or that his conditions resulted in no
physical or mental limitations.  Instead, she credited Mr. Lopez's subjective complaints of pain
to the extent supported by the evidence and found he had the physical residual capacity to
perform a reduced range of light work.  (Tr. 23.)  She also credited Mr. Lopez's subjective
symptoms relating to his mental health conditions to the extent supported by the evidence and
found he had the mental residual capacity to: carry out, concentrate, persist, and maintain pace
for completing simple, routine, repetitive tasks, with no strict quotas or time constraints; and
superficially interact with supervisors, coworkers, and the public, with superficial interaction
defined as work that does not involve any work tasks, such as arbitration, negotiation,
confrontation, being responsible for the safety of others, or directing the work of others.  (*Id.*)
The ALJ explained her RFC assessment, stating:

> [T]he record does not establish limitations that would preclude work activity within
> the residual functional capacity defined in this decision. The light exertional level
> with postural and environmental hazards limitations account for the claimant's
> combined physical impairments, including lumbar conditions with radiculopathy
> causing reduction in overall mobility, as well as side effects from medication. The
> additional environmental limitation to avoid concentrated exposure to extreme
> cold, extreme heat, humidity as well as dust, odors, fumes, and pulmonary irritants
> also accounts for asthma. Moderate limitation in understand, remember, and carry
> out, interact with others, concentrate, persist, or maintain pace, and adapt or manage
> oneself account for the claimant's combined mental impairments. These are
> consistent with simple, routine, repetitive tasks, but no strict quotas or time
> constraints, and superficially interact with supervisors, coworkers, and the public.

Accordingly, the undersigned finds the record does not establish limitations that would preclude work activity within the residual functional capacity defined in this decision.

(Tr. 28; *see also* Tr. 31.)

The Court finds Mr. Lopez's argument that the ALJ failed to adequately articulate her findings regarding his subjective complaints is without merit.  While Mr. Lopez argues that the evidence supports a finding that the symptoms from his pain and mental impairments were more limiting than the ALJ found them to be, it is not this Court's role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.  Mr. Lopez has not met his burden to show that the ALJ erred in considering his subjective complaints, and the ALJ adequately explained her reasons for finding the subjective complaints were not entirely consistent with other evidence in the record.  Accordingly, the Court finds Mr. Lopez's third assignment of error to be without merit.

## VII.   Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's final decision.

April 11, 2024

/s/Amanda M. Knapp
AMANDA M. KNAPP
United States Magistrate Judge